IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-667-D

| | | |
|---|---|---|
| CAMPBELL ALLIANCE GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| LYNN FORREST, and ANDREW KWON, | ) | |
| | ) | |
| Defendants. | ) | |

On December 23, 2015, Campbell Alliance Group, Inc. ("Campbell" or "plaintiff") sued defendants Lynn Forrest ("Forrest") and Andrew Kwon ("Kwon") (collectively "defendants") for breach of contract and injunctive relief to prevent defendants from violating their employment agreements [D.E. 1].[1] On September 23, 2016, the court held a hearing concerning Campbell's request for a preliminary injunction and denied that request [D.E. 64–65]. On March 23, 2017, defendants moved for summary judgment [D.E. 75] and filed a memorandum in support [D.E. 76]. On April 27, 2017, Campbell responded [D.E. 87]. On May 11, 2017, defendants replied [D.E. 102]. As explained below, defendants' motion for summary judgment is denied.

I.

Campbell is a pharmaceutical consulting company with its principal place of business in Raleigh, North Carolina. See Compl. [D.E. 1] ¶¶ 5, 11. In May 2008, Kwon began working for Campbell. See id. ¶ 32. In April 2010, Forrest began working for Campbell. See id. ¶ 20. In December 2011, Kwon left Campbell to return to school but Campbell rehired him in September 2013. See id. ¶ 34. Both Forrest and Kwon signed an "employee confidentiality, proprietary rights and intellectual property agreement" that contains restrictive covenants (the "employment

---

[1] Campbell also sued for breach of fiduciary duty but has since abandoned that claim. See [D.E. 87] 30.

agreement(s)"). See [D.E. 1-1, 1-2]. The employment agreements that Kwon and Forrest signed are identical in all material respects. See [D.E. 88] 8 ¶ 19. The employment agreements contain both a non-competition covenant and a non-solicitation covenant (collectively "restrictive covenants"). See [D.E. 1-1] (Sections 4.3, 4.4, 4.6). The non-competition covenant provides that

> [e]mployee agrees that during the Non-competition Period, Employee shall not, directly or indirectly, on behalf of Employee or on behalf of any person, firm, partnership, corporation, association or entity: (a) provide Covered Services to any Client or Actively Targeted Prospect of Campbell with whom Employee had any contact on behalf of Campbell during the last twelve (12) months of his or her employment with Campbell, or regarding whom Employee had significant exposure to Confidential Information through Campbell[.][2]

[D.E. 1-1] 5 (Section 4.6). The non-solicitation covenant provides that

> [e]mployee agrees that during the Non-solicitation Period, Employee will not directly or indirectly, on behalf of Employee or on behalf of any person, firm, partnership, corporation, association or entity solicit or call upon any Client or Actively Targeted Prospect of Campbell with whom Employee had contact on behalf of Campbell, or for whom Employee had significant exposure to Confidential Information through Campbell, during the last twelve (12) months of Employee's employment with Campbell for the purpose of inducing such client or prospective client to discontinue their relationship with Campbell or soliciting business that is the same, similar to, or in competition with the Business of Campbell.

[D.E. 1-1] 4 (Section 4.3). The employment agreements define "Client" or "Actively Targeted Prospect" as a "department within a company or other entity (under the control of a Director, VP or comparable position) for which Campbell has provided Covered Services or actively marketed (e.g., called upon to discuss) Covered Services." Id. The employment agreements define "Covered Services" as "the services provided by Employee for or on behalf of Campbell during Employee's employment with Campbell." Id. The non-competition covenant remains in effect for 12 months after the employee leaves Campbell, and the non-solicitation covenant remains in effect for 18 months after the employee leaves Campbell. See id. at 4–5. The employment agreements provide, however, that the period will be tolled during any time that the employee is not complying with the

---

[2] The court omits subsection (b) because Campbell is not seeking to enforce that portion of the covenant. See [D.E. 76] 3 n.4; [D.E. 87] 2.

covenants. See id. at 4.

The employment agreements contain an additional non-solicitation covenant that concerns solicitation of Campbell's employees. That provision provides

> [e]mployee agrees that during the Non-solicitation Period, Employee will not directly or indirectly, on behalf of Employee or on behalf of any person, firm, partnership, corporation, association or entity, hire (in any capacity) or call upon or solicit any person who is, or had been during the preceding 12 months, an employee . . . of Campbell, for the purpose of soliciting or inducing such employee . . . to discontinue his or her relationship with Campbell or to establish a relationship with any other person or business, whether or not it competes with the Business of Campbell.

[D.E. 1-1] 5. This covenant remains in effect for 18 months after the employee leaves Campbell and is also subject to tolling. See id. at 4.

Between July 2015 and October 2015, Kwon and Forrest discussed possible employment with Acsel Health, LLC ("Acsel"). See [D.E. 88] 40 ¶ 71. On August 10, 2015, Kwon resigned from Campbell, and on the same day, Forrest told her direct supervisor that she intended to resign. See id. 39 ¶¶ 66–67. Shortly thereafter, Forrest and Kwon began working for Acsel.

Campbell alleges that defendants breached their restrictive covenants by soliciting and providing "covered services" to "one of [Campbell's] largest pharmaceutical-group clients, the Janssen Pharmaceutical Companies of Johnson & Johnson, ("Janssen")." [D.E. 87] 2. Specifically, Campbell contends that while at Campbell, defendants performed work for the following "clients," as defined by the employment agreements: (1) the Oncology, Immunology, and Training departments at Janssen Global Services, LLC, (2) the Cardiovascular and Metabolic, Immunology, Oncology, and Training departments at Janssen Pharmaceuticals, Inc., (3) the Oncology department at Janssen Biotech, Inc., and (4) the Oncology department at Janssen Research & Development, LLC. See id. at 13. According to Campbell, each of these departments is Campbell's "client," and defendants violated their restrictive covenants by soliciting and providing covered services to individuals in these departments after joining Acsel. See id. at 10–13.

3

Defendants admit that they have performed work for at least ten different client contacts at Janssen related entities. Defendants worked with at least some of those contacts while employed at Campbell. See [D.E. 77] ¶¶ 76, 78 (defendants do not appear to dispute that they have worked with Meredith Unger and Annette Lam at both Campbell and Acsel); [D.E. 88] 42–43 ¶ 76.[3] In support of their motion for summary judgment, defendants argue that numerous provisions in the restrictive covenants are unenforceable. See [D.E. 76] 1–2. Defendants also contend that Campbell has failed to show the restrictive covenants are no broader than necessary to protect its legitimate business interests, that Campbell failed to show defendants solicited its clients, and that Campbell failed to identify what departments at Janssen are its "clients." See id.

## II.

In considering a motion for summary judgment, the court views the evidence in the light most favorable to the non-movant and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must demonstrate an absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v.

---

[3] The parties dispute the actual number of client contacts at Janssen for whom defendants have performed work while at Acsel. See [D.E. 88] 42–43 ¶ 76.

Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Likewise, a "mere . . . scintilla of evidence in support of the [nonmoving party's] position [will not suffice]; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252; see Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

This court has subject-matter jurisdiction based on diversity. Thus, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). Defendants' motion for summary judgment requires the court to consider the parties' state-law claims and defenses, and the parties agree that North Carolina law applies. Accordingly, the court applies North Carolina law, and the court must determine how the Supreme Court of North Carolina would rule. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). "If the Supreme Court of [North Carolina] has spoken neither directly nor indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue." Id. (quotation omitted).[4] In making that prediction, the court may consider opinions of the North Carolina Court of Appeals, treatises, and the practices of other states. See id.

### A.

Covenants not to compete between an employer and employee are not viewed favorably in modern law. See Henley Paper Co. v. McAllister, 253 N.C. 529, 534, 117 S.E.2d 431, 434 (1960); Kadis v. Britt, 224 N.C. 154, 159–60, 29 S.E.2d 543, 546 (1944); Farr Assocs., Inc. v. Baskin, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000); Hartman v. W.H. Odell & Assocs., Inc., 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994). The party who seeks to enforce a covenant not to

---

[4] North Carolina does not have a "mechanism . . . to certify questions of state law to its Supreme Court." Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

5

compete must prove that the covenant is reasonable. See, e.g., Kadis, 224 N.C. at 158, 29 S.E.2d at 545.

North Carolina courts will enforce a covenant not to compete if it is: "(1) in writing; (2) reasonable as to [the] terms, time, and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." Triangle Leasing Co. v. McMahon, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990); see United Labs., Inc. v. Kuykendall, 322 N.C. 643, 649–50, 370 S.E.2d 375, 380 (1988); Eng'g Assocs., Inc. v. Pankow, 268 N.C. 137, 139, 150 S.E.2d 56, 58 (1966); James C. Greene Co. v. Kelley, 261 N.C. 166, 168, 134 S.E.2d 166, 167 (1964); Orkin Exterminating Co. v. Griffin, 258 N.C. 179, 181, 128 S.E.2d 139, 140–41 (1962) (per curiam); Asheville Assocs., Inc. v. Miller, 255 N.C. 400, 402, 121 S.E.2d 593, 594 (1961).

The reasonableness of a non-competition covenant is a matter of law for the court to decide. See Shute v. Heath, 131 N.C. 281, 282, 42 S.E. 704, 704 (1902). "To be valid, the restrictions must be no wider in scope than is necessary to protect the business of the employer." Med. Staffing Network, Inc. v. Ridgway, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009) (quotation omitted); see Triangle Leasing Co., 327 N.C. at 229, 393 S.E.2d at 857; Manpower of Guilford Cty., Inc. v. Hedgecock, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979). "When considering the enforceability of a covenant not to compete, a court examines the reasonableness of its time and geographic restrictions, balancing the substantial right of the employee to work with that of the employer to protect its legitimate business interests." Okuma Am. Corp. v. Bowers, 181 N.C. App. 85, 86, 638 S.E.2d 617, 618 (2007). In evaluating a covenant not to compete, a court must consider time and geographic limitations in tandem. See, e.g., Jewel Box Stores Corp. v. Morrow, 272 N.C. 659, 665, 158 S.E.2d 840, 844 (1968). Generally, the shorter the time period in the covenant not to compete, the larger the geographic restriction may be. See id., 158 S.E.2d at 844. Likewise, the longer the time period in the covenant not to compete, the smaller the geographic restriction must be. See id., 158 S.E.2d at 844.

6

In assessing the reasonableness of the terms of a covenant not to compete, North Carolina law does not permit an employer to use a covenant not to compete to prevent an employee from working for a competitor in any capacity. See, e.g., Henley Paper Co., 253 N.C. at 531–35, 117 S.E.2d at 432–34; Hejl v. Hood, Hargett & Assocs., Inc., 196 N.C. App. 299, 306–07, 674 S.E.2d 425, 430 (2009); VisionAIR, Inc. v. James, 167 N.C. App. 504, 508–09, 606 S.E.2d 359, 362–63 (2004); Hartman, 117 N.C. App. at 317, 450 S.E.2d at 920; Elec. S., Inc. v. Lewis, 96 N.C. App. 160, 166–68, 385 S.E.2d 352, 356–57 (1989). Nonetheless, the "protection of customer relationships and good will against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." Kuykendall, 322 N.C. at 651, 370 S.E.2d at 381. Moreover, a properly drafted covenant not to compete can protect a legitimate business interest, particularly where the nature of the employment brings "the employee in personal contact with patrons or customers of the employer, or enable[s] [the employee] to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers." A.E.P. Indus., Inc. v. McClure, 308 N.C. 393, 408, 302 S.E.2d 754, 763 (1983); see Harwell Enters., Inc. v. Heim, 276 N.C. 475, 480, 173 S.E.2d 316, 320 (1970); Med. Staffing Network, Inc., 194 N.C. App. at 656, 670 S.E.2d at 327. Thus, where an employee has such customer contact, the employer has a legitimate business interest in preventing the employee from moving into a materially indistinguishable position with a competitor vis-à-vis such customers. See, e.g., Med. Staffing Network, Inc., 194 N.C. App. at 656, 670 S.E.2d at 327; Okuma Am. Corp., 181 N.C. App. at 90–91, 638 S.E.2d at 620–21.

1.

Initially, defendants argue that the restrictive covenants are not enforceable against Forrest because they were not supported by adequate consideration. According to the defendants, Forrest began working for Campbell in April 2010 but did not sign the restrictive covenants until June 7, 2010. See [D.E. 76] 4.

7

Forrest signed and dated her Campbell offer letter on November 28, 2009. See [D.E. 96] 4. The offer letter stated that Forrest's offer was contingent on her signing and executing the employment agreement that contains the restrictive covenants at issue. See id. at 3. The offer letter also stated that the employment agreement, which contains the restrictive covenants, was attached. See id. at 4. Ivy Robertson, Campbell's Senior Human Resources Coordinator, testified that, as a matter of common practice, she always sends the employment agreement with the offer letter. See [D.E. 81-12] 4; Fed. R. Evid. 406. If a covenant is contemplated and negotiated as part of the original offer of employment, it is based on valuable consideration, even if the covenant is not formally signed until a later date. See, e.g., Young v. Mastrom, Inc., 99 N.C. App. 120, 123, 392 S.E.2d 446, 448 (1990). Viewing the record in the light most favorable to Campbell, it appears that the parties discussed and negotiated the restrictive covenants as part of Forrest's original offer of employment. At best, genuine issues of material fact preclude summary judgment.

Next, defendants argue that section 4.6, the non-competition covenant, does not apply to Kwon because section 4.6 states "this sub-section shall not apply in the state of California." [D.E. 1-2] 5; see [D.E. 76] 7. According to Kwon, he now lives in California. Thus, Kwon argues that section 4.6 does not apply to him.[5]

The court rejects this argument. Section 4.6 recognizes that California, with few exceptions, prohibits non-competition covenants that restrict employees' freedom of employment. Section 4.6 does not, however, relieve Kwon of his contractual obligations simply because he moved to California after signing a restrictive covenant. See, e.g., Roesgen v. Am. Home Prods. Corp., 719 F.2d 319, 321 (9th Cir. 1983).

To the extent Kwon argues that California law applies to the breach of contract claim against him, the court rejects the argument. The employment agreement contains a choice of law clause

---

[5] Although Kwon now lives in California, Kwon lived in New York when he signed the restrictive covenants. See [D.E. 1-2]; [D.E. 81-4] 3.

selecting North Carolina law. See [D.E. 1-2] 7. Generally, courts in North Carolina will enforce a choice of law provision unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,
> or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be the state of applicable law in the absence of an effective choice of law by the parties.

Classic Coffee Concepts, Inc. v. Anderson, 2006 NCBC 21, 2006 WL 3476598, at *11 (N.C. Super. Ct. Dec. 1, 2006) (unpublished) (alteration omitted); see Cable Tel Servs., Inc. v. Overland Contracting, Inc., 154 N.C. App. 639, 642–43, 574 S.E.2d 31, 33–34 (2002). Here, North Carolina has a substantial relationship to the parties because Campbell is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. See Compl. ¶ 5. As for subsection (b), California does not have a materially greater interest than North Carolina in this particular issue. North Carolina's interest in freedom of contract is materially greater than California's interest in protecting Kwon's freedom of employment. See, e.g., Roesgen, 719 F.2d at 321 ("We conclude that New York's interest in furthering freedom to contract by upholding the parties' expectations would be much more seriously impaired by applying California law than California's interest in furthering freedom of employment for its citizens . . . .").[6] Moreover, California law would not apply even if the employment agreement did not contain a choice of law provision. Courts in North Carolina generally follow the principle that the law of the forum where the contract is made governs the validity and interpretation of the contract. See, e.g., Cunningham v. Brown, 51 N.C. App. 264, 268, 276 S.E.2d 718, 722 (1981); Tanglewood Land Co. v. Wood, 40 N.C. App. 133, 136–37, 252 S.E.2d 546, 550 (1979). Here, no evidence suggests that the contract was executed in California.

---

[6] California has a strong public policy interest in protecting the mobility of employees and freedom of employment. See, e.g., Metro Traffic Control, Inc. v. Shadow Traffic Network, 27 Cal. Rptr. 2d 573, 577 (Cal. Ct. App. 1994). That interest is not at issue. Campbell is not seeking to prevent Kwon from working for Acsel. See [D.E. 87] 2.

9

Accordingly, North Carolina law applies, and North Carolina recognizes the validity of restrictive covenants. Cf. Tourmaline Partners, LLC v. Monaco, No.: 3:13-cv-00108 (VAB), 2016 WL 614361, at *10 (D. Conn. Feb. 16, 2016) (unpublished) ("While [defendant] now lives in California and California law disfavors non-competition covenants, . . . California does not have a materially greater interest in this action, and California law would not otherwise apply had it not been for the [choice of law provision].").

2.

Defendants argue that the definition of "client," which applies to both the non-solicitation covenant and the non-competition covenant, is overbroad and renders the covenants unenforceable. See [D.E. 76] 9–11. Specifically, defendants contend that

> [t]here are over 200 possible Janssen affiliates housed in the holding company Johnson and Johnson. Out of the 200 possible affiliates, there are fifty-one (51) entities worldwide with the word "Janssen" as part of their name. According to Campbell, all fifty-one (51)—and potentially all 200—of these companies are its "clients."

[D.E. 76] 9–10 (citations omitted). Defendants also argue that, while at Campbell, they only worked for individuals at four Janssen affiliated entities and that it is unreasonable to prevent them from soliciting or servicing an entire company or other entities within Janssen for which Campbell has not done work. See id. at 10–11.

The employment agreement defines "client" as "a department within a company or other entity (under the control of a Director, VP or comparable position) for which Campbell has provided Covered Services . . . ." [D.E. 1-1] 4 (emphasis added). Consistent with this definition, Campbell seeks only to prevent defendants from "working with a well-defined group of Campbell's clients: those in departments within companies at Janssen that Defendants worked with . . . [or] had significant exposure to "Confidential Information" through [their] employment with Campbell." [D.E. 87] 11. Thus, Campbell is not trying to prevent defendants from working with an entire company. Indeed, Campbell is not even trying to prevent defendants from doing work for the four

10

Janssen affiliated entities for which defendants did work while at Campbell. Rather, Campbell is trying to prevent defendants from doing work for a department at a Janssen affiliated entity that defendants had contact with during the last 12 months of employment or had significant exposure to confidential information.

Defendants also argue that the definition of "client" prohibits more conduct than is reasonably necessary to protect Campbell's legitimate business interest. As for Campbell's legitimate business interest, employers have a legitimate interest in protecting their goodwill and customer relations from "misappropriation by [a] departing employee[]." Kuykendall, 322 N.C. at 651, 370 S.E.2d at 381. A restrictive covenant is reasonably necessary to protect a legitimate business interest if "the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers." Medical Staffing Network, 194 N.C. App. at 656, 670 S.E.2d at 327 (quotation and alterations omitted); see Triangle Leasing, 327 N.C. at 229, 393 S.E.2d at 857–58; A.E.P. Indus., 308 N.C. at 408, 302 S.E.2d at 763. During their employment at Campbell, defendants had extensive personal contact with and exposure to certain departments within Janssen affiliated entities. Through these contacts, defendants had the opportunity to become familiar with the client's needs, requirements, and operations, which placed "defendant[s] in an unfair competitive position as to [Campbell]" when defendants left Campbell to work for Acsel. Kuykendall, 322 N.C. at 651, 370 S.E.2d at 381 (quotation and alteration omitted); see Wilmar, Inc. v. Corsillo, 24 N.C. App. 271, 274, 210 S.E.2d 427, 430 (1974). Because defendants could use client contacts and confidential client information obtained while employed at Campbell to compete directly with Campbell, the restrictive covenants were reasonably necessary to protect Campbell's legitimate business interest. See, e.g., United Healthcare Servs., Inc. v. Richards, No. 3:96CV215, 2010 WL 3895705, at *2 (W.D.N.C. Sept. 30, 2010) (unpublished).

11

As for the requirement that restrictive covenants be "no broader than necessary," defendants cite four cases in support of their argument that the definition of "client" is broader than necessary to protect Campbell's legitimate business interests. In <u>Clinical Staffing, Inc. v. Worldwide Travel Staffing Limited</u>, this court held that a covenant not to compete was unenforceable when it prohibited the plaintiff's former employees from providing any service of any kind to any of plaintiff's clients. 60 F. Supp. 3d 618, 625 (E.D.N.C. 2013). In finding the restrictive covenant unenforceable, this court noted that it prevented the plaintiff's former employees from providing any type of service to any of the plaintiff's clients, including "food preparation services, custodial services, or secretarial services," even if the employee did not interact with the client while employed by the plaintiff. <u>Id.</u> In <u>Farr Associates Inc. v. Baskin</u>, the North Carolina Court of Appeals held that the restrictive covenant at issue was unenforceable because it prevented the defendant from working for all of plaintiff's current and recent clients, regardless of whether the defendant had any contact with the client. <u>See</u> 138 N.C. App. at 282, 530 S.E.2d at 882 ("The covenant in question prevents [defendant] from working for all of [plaintiff's] current or recent clients, regardless of where the client is located, whether he had any contact with them, or whether he even knew about them."). In <u>Henley Paper Company v. McAllister</u>, the Supreme Court of North Carolina held that the restrictive covenant at issue was unenforceable because it prevented defendant from "directly or indirectly engaging in the manufacture, sale or distribution of paper or paper products," even though defendant's work for the plaintiff was limited to distributing fine paper. 253 N.C. at 534–35, 117 S.E.2d at 434. Thus, defendant was effectively barred from seeking employment in any capacity in the paper industry. <u>See id.</u> In <u>MJM Investigations, Inc. v. Sjostedt</u>, the North Carolina Court of Appeals held that the restrictive covenant at issue was overbroad because it did not define "client" and "client" could be read to "cover all branches, divisions, and affiliates of a 'client,'" even if the defendant did not have any contact with the entity at issue. 205 N.C. App. 468, 698 S.E.2d 202, 2010 WL 2814531, at *3 (2010) (unpublished table decision).

12

These four cases are distinguishable. In each case, the former employers sought to restrict the former employees from working with or for clients that they did not have any contact with while employed by the plaintiff-employer. In contrast, the definition of "client" in this case does not present the issues identified in those four cases. Specifically, the definition of "client" does not prevent defendants from providing any type of service to any of Campbell's clients and does not cover all branches, divisions, and affiliates of Campbell's clients.

Next, defendants contend that the definition of "client" is overbroad when applied to the Janssen corporate entities. See [D.E. 76] 11. Specifically, defendants contend that defining a client as a "department" is overbroad and that client should instead be defined as a "client sponsor." See id. at 12, 14. According to defendants, numerous individuals within a department at a Janssen entity could become a "client sponsor" and the restrictive covenant prevents defendants from working with all potential "client sponsors" within a department, even though Campbell has not serviced all of the "client sponsors." See id.

The court rejects this argument. As discussed, the definition of "client" is limited to departments within a larger entity that defendants had contact with during the last 12 months of employment or had significant exposure to confidential information through Campbell. See [D.E. 1-1] 4. There are 51 Janssen affiliated entities. See [D.E. 76] 10. The covenants do not prohibit defendants from working with the 47 affiliated entities that they did not have contact with during their employment at Campbell. Indeed, the covenants do not even prohibit defendants from performing work for the four Janssen affiliated entities that they did have contact with during their time at Campbell, provided defendants work with departments within those entities that they did not have contact with or significant exposure to confidential information during their employment with Campbell. See [D.E. 87] 14.[7] While employed at Campbell, defendants had an opportunity to gain

_____

[7] Defendants argue that "Campbell effectively seeks to preclude defendants from doing business with thousands of potential client sponsors or extended team members or other personnel

13

client contacts within the departments at Janssen to which they had contact, and to learn confidential information about those departments that they could use to compete directly with Campbell. See, e.g., Triangle Leasing Co., 327 N.C. at 229, 393 S.E.2d at 857–58 ("[T]here is ample evidence to support plaintiff's contention that [defendant's] access to customer lists, price sheets, and policies affecting company business . . . would warrant a contractual prohibition against solicitation of [plaintiff's] customers regardless of their location."). Accordingly, the definition of "client" is not broader than necessary to protect Campbell's legitimate business interest. See, e.g., id., 393 S.E.2d at 857–58; Wade S. Dunbar Ins. Agency, Inc. v. Barber, 147 N.C. App. 463, 469, 556 S.E.2d 331, 335–36 (2001).

Defendants also argue that Campbell has failed to identify what departments at Janssen entities are its "clients" because the employment agreements' definition of "client" is too amorphous. See [D.E. 76] 11 n.11, 13. Defining "clients" as "a department within a company or other entity (under the control of a Director, VP or comparable position)," however, is not too amorphous to be enforceable. "Department" is a "a functional or territorial division: such as . . . a major division of a business."[8] The requirement that the major division be "under the control of a Director, VP or comparable position" further narrows this definition. [D.E. 1-1] 4. Moreover, Campbell has identified Janssen's departments and what departments are its "clients." See Keith Kelly 3d Decl. [D.E. 98] 4–6, 28–65 (noting that Janssen focuses its business in five therapeutic areas and that each

who view Campbell's work product, who are working on any one of fifty-four (54) drug brands, in potentially any one of 200 affiliated companies." [D.E. 76] 14. The court rejects this argument. The argument ignores the restrictive covenant's definition of "client." Here, Campbell merely seeks to preclude defendants from "working with a well-defined group of Campbell's clients: those in departments within companies at Janssen that Defendants worked with during their last 12 months at Campbell or about which they had significant exposure to 'Confidential Information' through [their] employment with Campbell." [D.E. 87] 11.

[8] Merriam-Webster Dictionary, Department, https://www.merriam-webster.com/dictionary/department (last visited Mar. 27, 2018).

14

of the areas is treated as a department); [D.E. 88] 60 ¶ 14 (identifying Campbell's "clients" that defendants worked for during their employment at Campbell); see also Keith Kelly 2d Decl. [D.E. 61-1] 6 (¶ 19), 10–11. Nonetheless, defendants argue that this court should ignore Keith Kelly's declaration because it contradicts his deposition testimony concerning the departments at Janssen entities. See [D.E. 102] 2–3. The cited deposition testimony, however, does not show that Campbell failed to identify the departments at Janssen that it considers to be its clients. To the extent defendants argue that Campbell improperly identified what constitutes a "department" at Janssen, defendants have not offered sufficient evidence to show Campbell's classifications are improper or incorrect. Furthermore, even if defendants did offer such evidence, defendants would still need to show that they did not solicit or provide covered services to these departments. Defendants have not made this showing.

Next, defendants argue that section 4.6(a) is unenforceable because it seeks to prohibit defendants from "directly or indirectly" providing covered services to any client with whom employee had any contact on behalf of Campbell during the last 12 months of his or her employment with Campbell. See [D.E. 76] 15–16. Defendants contend that the term "indirectly" is overbroad and that this provision "prohibits them from being employed in any capacity, that in any way supports or benefits Acsel's provision of consulting services to Acsel clients." Id. at 16 (emphasis omitted)

The court rejects this argument. First, the provision does not seek to restrain defendants from being employed in any capacity. As discussed, the provision simply seeks to restrain defendants from providing covered services to a discrete group of Campbell's clients. Moreover, the term "indirect" is not overbroad. This term is included to prevent defendants from circumventing standard procedures and channels of communication to provide covered services in violation of the restrictive covenants. Courts in North Carolina have held similar language in similar covenants to be enforceable. See, e.g., Triangle Leasing Co., 327 N.C. at 228–230, 393 S.E.2d at 857–58; GE

15

Betz, Inc. v. Conrad, 231 N.C. App. 214, 227–28, 752 S.E.2d 634, 645 (2013); Boice-Willis Clinic, P.A. v. Seaman, 175 N.C. App. 246, 623 S.E.2d 89, 2005 WL 3470326, at *1–4 (2005) (unpublished table decision).

Defendants also contend that section 4.3 is unenforceable because it prohibits defendants from soliciting business from Campbell's clients that is "the same, similar to, or in competition with the Business of Campbell." [D.E. 76] 19. Defendants argue that this restriction is "not tethered in any way to defendants' employment with Campbell, and as a result it cannot be connected to protecting any of Campbell's legitimate business interests." Id. Defendants also argue that the phrase "similar to" is unenforceable. Id.

Defendants' argument fails. Section 4.3 provides

[e]mployee agrees that during the Non-solicitation Period, Employee will not . . . call upon any Client . . . with whom Employee had any contact on behalf of Campbell, or for whom Employee had significant exposure to Confidential Information through Campbell, during the last twelve (12) months of Employee's employment with Campbell for the purpose of inducing such client or prospective client to discontinue their relationship with Campbell or soliciting business that is the same, similar to, or in competition with the Business of Campbell.

[D.E. 1-1] 4. Section 4.3 seeks to restrain defendants from soliciting a discrete group of Campbell's clients. Thus, contrary to defendants' argument, the covenant does not seek to restrict defendants from "soliciting alleged clients of any of Campbell's affiliated companies." [D.E. 76] 19. Moreover, the phrase "similar to" is not unenforceable. See, e.g., Kinesis Advert., Inc. v. Hill, 187 N.C. App. 1, 14, 652 S.E.2d 284, 294 (2007).

Next, defendants argue that sections 4.6(a) and 4.3 are unenforceable because they "prohibit defendants from soliciting or servicing entities if defendants have had 'significant exposure' to that client's confidential information." [D.E. 76] 18. According to defendants, "significant exposure" is not defined and it might cover clients who defendants causally discussed with a co-worker or a client whose information defendants briefly viewed in a communal workspace. See id.

The court rejects defendants' argument concerning the term "significant." "Significant" means "having or likely to have influence or effect: deserving to be considered: important, weighty, notable" and is contrasted with "negligible[.]" Rutledge v. Tultex Corp./Kings Yarn, 308 N.C. 85, 101–02, 301 S.E.2d 359, 370 (1983) (quotation and citation omitted). Thus, the term means important, notable, or weighty exposure to that client's confidential information.

Next, defendants argue that including "Actively Targeted Prospect" in the definition of "client" renders the restrictive covenants unenforceable because courts have held that restrictive covenants that reach prospective clients are unenforceable. See [D.E. 76] 15. The court rejects this argument. Campbell does not seek to prevent defendants from soliciting or providing covered services to any of its potential clients. Rather, Campbell seeks only to prevent defendants from soliciting or providing covered services to an "Actively Targeted Prospect" that defendants had contact with during the last 12 months of employment or had significant exposure to confidential information. Such a restriction is both reasonable and enforceable. See, e.g., Wade S. Dunbar, 147 N.C. App. at 469, 556 S.E.2d at 335–36.

Defendants also argue that the restrictive covenants are temporally and territorially overbroad. See [D.E. 76] 16–18, 21–23. As for defendants argument concerning territory, defendants contend that section 4.6 is unenforceable because it does not include a territorial restriction and that even client-based non-compete agreements are required to include a territorial restriction. In support, defendants cite Professional Liability Consultants, Inc. v. Todd, 122 N.C. App. 212, 218–19, 468 S.E.2d 578, 582 (1996) (Smith, J., dissenting), rev'd, 345 N.C. 176, 176, 478 S.E.2d 201, 202 (1996) (per curiam). In Todd, the Supreme Court adopted the dissenting opinion of Judge Smith and refused to enforce a client-based convent not to compete that contained no geographic or numerical restriction as to the client base and that lasted for five years. See Todd, 345 N.C. at 176, 478 S.E.2d at 202.

17

Before Todd, many believed that noncompete covenants generally required an expressly defined geographical territory in order to be enforceable, but that a client-based noncompete covenant without an expressly defined geographical territory could be enforceable in North Carolina. Compare Pankow, 268 N.C. at 139, 150 S.E.2d at 58 (invalidating a covenant not to compete restricting a project engineer for five years from working for any competitor of his employer and containing no expressly defined geographic territory), with Kuykendall, 322 N.C. at 657–60, 370 S.E.2d at 385–86 (applying Illinois law and enforcing a noncompetition agreement that included client-based restrictions for 18 months without any expressly defined geographical territory other than the employee's sales territory at the time of termination), Whittaker Gen. Med. Corp. v. Daniel, 324 N.C. 523, 528–29, 379 S.E.2d 824, 828 (1989) (relying on Kuykendall and enforcing a noncompetition agreement that included client-based restrictions for 24 months without any expressly defined geographical territory other than the employee's sales territory at the time of termination), and Triangle Leasing Co., 327 N.C. at 229, 393 S.E.2d at 857–58 (enforcing noncompetition agreement restricting an employee for 24 months from soliciting employer clients in areas in which the employer operates without any expressly defined geographical territory). Since Todd, the North Carolina Court of Appeals has cited Kuykendall, Whittaker General Medical Corporation, and Triangle Leasing Company, and held, consistent with the pre-Todd understanding, that a client-based covenant not to compete without an expressly defined geographical territory is not automatically invalid. See Okuma Am. Corp., 181 N.C. App. at 90–91, 638 S.E.2d at 620–22; Wade S. Dunbar, 147 N.C. App. at 469, 556 S.E.2d at 335–36; Farr Assocs., 138 N.C. App. at 281–83, 530 S.E.2d at 882–83; Market Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 153–54, 520 S.E.2d 570, 578 (1999).

The court need not reconcile Todd with earlier cases from the Supreme Court of North Carolina or later cases from the North Carolina Court of Appeals because the restrictive covenants include a territorial restriction that should be applied in the event "a court of competent jurisdiction

holds that any of the provisions set forth in this Section 4 are unenforceable due to the absence of a geographical territory." [D.E. 1-1] 5 (section 4.5). Defendants apparently do not contend that the territorial restriction contained in section 4.2(e) is overbroad and the court concludes that it is not. See id. at 4. The restriction is limited to nine states, the United Kingdom, and any "city, metropolitan area, county (or similar political subdivisions in foreign countries) in which [defendants] provided or supervised the provision of Covered Services on behalf of Campbell in the last twelve (12) months of Employee's employment with Campbell" [D.E. 1-1] 4 (section 4.2(e)). Considering the national and international scope of both Campbell's operations and its clients' operations, this restriction is reasonable. See, e.g., Heim, 276 N.C. at 480–81, 173 S.E.2d at 320; Okuma Am. Corp., 181 N.C. App. at 90, 638 S.E.2d at 620–21.

As for defendants argument that the covenants are temporally overbroad, a "five-year time restriction is the outer boundary which [courts in North Carolina] have considered reasonable." Farr Assocs., 138 N.C. App. at 280, 530 S.E.2d at 881. The non-competition covenant includes a one-year time restriction and the non-solicitation covenant includes an 18-month time restriction. The covenants also include a one-year look-back period. See, e.g., Hejl, 196 N.C. App. at 306, 674 S.E.2d at 429; [D.E. 1-1] 4. Accordingly, the time restrictions are two years and two and a half years respectively. Courts in North Carolina have routinely found time restrictions in this range reasonable. See, e.g., Heim, 276 N.C. at 481, 173 S.E.2d at 320; Hejl, 196 N.C. App. at 306, 674 S.E.2d at 429 (finding three-year time restraint to be reasonable).

In opposition to this conclusion, defendants contend that the time restrictions extend considerably longer than the stated periods because the covenants are subject to tolling. See [D.E. 76] 21–22; [D.E. 1-1] 4. The court disagrees. The tolling provision in this case states that the covenant does not run during any period of noncompliance. See [D.E. 1-1] (Section 4.2(c)). If the court ultimately determines that defendants have not been in compliance, it could order a period of compliance consistent with the contractual language.

19

Alternatively, assuming without deciding that the time period with the tolling provision is unreasonable, the court could apply the blue pencil doctrine to the time period.[9] Under the blue pencil doctrine, North Carolina courts "cannot rewrite a faulty covenant not to compete but may enforce divisible and reasonable portions of the covenant while striking the unenforceable portions." Beverage Sys. of Carolinas, LLC v. Associated Beverage Repair, LLC, 368 N.C. 693, 696, 784 S.E.2d 457, 460 (2016); see Hartman, 117 N.C. App. at 317, 450 S.E.2d at 920. The unenforceable portion does not need to be "separated off by number or in a different clause" as long as the "language can readily be struck through and the rest of the restrictive covenant still makes sense and stands on its own." Superior Performers, Inc. v. Meaike, No. 1:13CV1149, 2014 WL 1412434, at *11 (M.D.N.C. Apr. 11, 2014) (unpublished); see Amerigas Propane, L.P. v. Coffey, 2015 NCBC 93, 2015 WL 6093207, at *10 n.6 (N.C. Super. Ct. Oct. 15, 2015) (unpublished). The tolling provision is separate and divisible. Accordingly, the tolling provision does not render the restrictive covenants unenforceable. See, e.g., Whittaker Gen. Med. Corp., 324 N.C. at 528, 379 S.E.2d at 828.[10]

3.

Defendants also argue that they are entitled to summary judgment because Campbell has not produced evidence that defendants breached the non-solicitation covenant. See [D.E. 76] 23–27. Contrary to defendants' argument, Campbell has produced evidence sufficient to create a genuine issue of material fact concerning whether defendants breached the non-solicitation covenant. For example, defendants e-mailed client contacts that defendants had contact with on behalf of Campbell to provide these clients with their updated contact information. See [D.E. 92] 39–48. Some of these e-mails include a description of the work defendants are doing at Acsel and state "[p]lease use our

---

[9] The employment agreements authorize the court to apply the blue pencil doctrine. See [D.E. 1-1] 5.

[10] The same principles apply to the tolling provision in section 4.2(d).

new contact info if you need to reach us," e.g., id. at 45, or "I wanted to make sure you have my new contact information." E.g., id. at 48; see also [D.E. 61-4] 105. Moreover, viewing the record in the light most favorable to Campbell, the record shows that defendants have provided covered services to Campbell's clients, as defined by the employment agreements. See [D.E. 88] 63–65 ¶¶ 31–32; [D.E. 81-17]; [D.E. 77] ¶¶ 76, 78. For example, defendants provided services to Meredith Unger while at both Campbell and Acsel. See [D.E. 81-17]; [D.E. 77] ¶¶ 76, 78.

### III.

In sum, the court DENIES defendants' motion for summary judgment [D.E. 75]. The parties shall engage in a court-hosted settlement conference with United States Magistrate Judge Gates. Judge Gates will contact the parties about the settlement conference. If the case does not settle, the court will schedule a bench trial in due course.

SO ORDERED. This 27 day of March 2018.

JAMES C. DEVER III
Chief United States District Judge

21